# SUPREME COURT.

## ADAM BROWN and others agt. FREDERICK A. ASHBOUGH.

If a plaintiff, in his action embraces demands, in which he is not entitled to the remedy of *arrest*, with those in which he is entitled to such remedy, the remedy is *waived*. He can have but one judgment and one execution, and he has no right to imprison the debtor for such portion of the debt as was not fraudulently contracted.

A creditor, in an action upon promissory notes given by the debtor for the purchase of goods, alleged to be procured by false representations, who applies for an order of *arrest*, should distinctly understand that he is not entitled to this remedy unless a fraud—a cheat has been practiced upon him. The representations must be material, and such as are well calculated to deceive to induce credit; they must of course, be false, and the party making them must know them to be false; the party giving the credit must believe the representations to be true, and they must have induced—caused him to give the credit and part with his property.

Our remedy by arrest is applicable to cases where the debt is fraudulently contracted in a *foreign country*. And it is not material whether the defendant has *any property or not*. The remedy is governed by the *lex fori*; and this is so though by the law of the country where the transactions arose, and of which the parties were residents, the defendant could not be arrested.

But the 5th sub. of § 179 of the Code, viz : "when the defendant has removed or disposed of his property, or is about to do so with intent to defraud his creditors," cannot be applied to cases arising in foreign countries. (*See to the same effect Blason* agt. *Bruno*, 21 *How.*, 112.)

*Held*, in this case (all the parties formerly residing in Canada, where the debts were contracted, &c.—the defendant now residing in this state), that the plaintiffs were not entitled to the remedy by arrest in the causes of action to recover the amount of the notes, as the defendant was not guilty of fraud in contracting the debts for which the notes were given.

*Erie Special Term, November,* 1870.

MOTION to vacate order of arrest granted by the Erie County judge. The case is sufficiently stated in the opinion.

JOHN DOUGLASS, *attorney for plaintiffs,*
E. C. SPRAGUE, *of counsel.*
NICHOLS & ROBBINS, *for defendant.*

MARVIN, J.—The affidavits, upon which the order of ar-

rest was granted, show that the plaintiffs and the defendant resided in Hamilton, Canada; the former were wholesale grocers and liquor merchants; and the defendant was in the same business in the retail way, and made purchases of goods of the plaintiffs, frequently giving notes for the goods purchased or for balance of account, some payable in four, others in three months, and others in a shorter time. The first note mentioned bears date May, 26th, 1870, was payable at the end of four months, the amount being $278 87, then follow five other notes, the last dated August 26th, 1870, amount $537 62. They amount to a little over $3,000, that had become due when the action was commenced. On the 28th September, the defendant made a sale of his stock in trade and his lease to one White, and on the 24th September, departed from Canada to this state, bringing with him, as the affidavits tend to prove, the proceeds of the sale to White, and perhaps something more. The principal ground for the order of arrest, and upon which it was granted, was that the defendant had been guilty of fraud in contracting the debts, (*Code, sub.* 4, § 179). Also upon the ground, that the defendant had disposed of his property with intent to defraud his creditors, (*sub.* 5, *Id.*)

It is stated in the affidavit of Brown, one of the plaintiffs, presented to the county judge for the order of arrest, that the action is brought to recover the amount of the said promissory notes, and to recover damages for the fraud and deceit of the defendant in obtaining the said goods on credit, and disposing of the same and bringing the proceeds to the United States. This allegation will be hereafter noticed. The order of arrest was made upon the affidavit of plaintiff Brown; the motion to vacate the order was made upon the affidavit of the defendant, and there are four other affidavits; and numerous affidavits are read in reply in support of the order. The papers are very voluminous, and are very satisfactory, touching the general history of the defendant's business, and his condition as to solvency, at the times stated,

and from which certain inferences are sought to be drawn, touching the question of fraud in contracting the debts, but the facts stated as to the defendant's representations, and upon which it is alleged credits were obtained, are not very voluminous. It is upon these facts that the order of arrest is to be sustained, so far as the obtaining of goods upon credit is concerned. The plaintiff Brown, after stating that the defendant at divers times, since January, 1870, purchased of the plaintiffs a large quantity of groceries, &c., says, that at the times of obtaining the said goods on credit, * * * and for the purpose of inducing the plaintiffs to make sale of said goods to him on credit, the said defendant represented to the plaintiffs and to this deponent personally, that he, the defendant, had a large trade, and was doing well, and making money, and was able to pay his debts, and induced the plaintiffs to believe, he was solvent, he further represented to the deponent, that he had got, or was getting, $1,000 from his brother, who resides at Hamilton, to increase his capital, which statement was false, as the deponent is informed by his said brother, and verily believes that the defendant solely by means of said representations, led this deponent and the plaintiffs to believe, that the defendant was solvent and able to pay the said promissory notes, at maturity, and that on the faith of such representations the plaintiffs gave him the credit, which is represented by said notes * * *, and that if it had not been for the belief of the plaintiffs that said representations were true, the plaintiffs would not have given the said defendant the said credit, or any credit at all. It is then alleged that the defendant, at the time he made the representations, knew he was insolvent, that during all said times the defendant owed debts to the amount of about $14,000; that the value of his stock in trade was about $5,000, &c., &c. Then follows the statement of the sale by defendant of his stock in trade, September 23d, to White, for $1,500, and his leaving Canada with the money, &c.

Brown agt. Ashbough.

The affidavit made by the defendant to procure the vacation of the order of arrest is very full; it appears from it, that the defendant commenced the business in Hamilton, about June, 1868, with a capital of 81,600; he, at that time, commenced buying goods of the plaintiffs, and then informed them of the amount of his capital; that he continued buying goods of the plaintiffs until in February, 1869, when he took account of stock and found that he was entirely solvent and able to pay his debts, and that his capital had not been impaired, and he had sustained no losses; that up to this time the aggregate of his purchases of the plaintiffs was $10,000 and upwards, and he had paid the plaintiffs on account of such purchases $8,000, and upwards, and he then owed the plaintiffs not exceeding $2,000. He continued his business up to the 24th September, 1870, and made purchases of the plaintiffs from time to time, after taking the account of stock, to the amount in the aggregate, of $20,000 and upwards, and he paid to the plaintiffs on account of such purchases, more than $17,000. The affidavit then negatives all the allegations in Brown's affidavit, of representations made by him, to any of the plaintiffs touching his circumstances, or business, "credit, standing, ability, solvency or otherwise," for the purposes of inducing credit, &c., and he denies each and every allegation in that behalf, contained in Brown's affidavit. On the contrary, the plaintiffs often solicited him to make purchases up to the time he closed his business, September 24th, 1870. He states that he did not know, at the times of the pretended representations, that he was insolvent and could not pay his debts; and that his indebtedness, at such times, was not $14,000; he says his stock in trade was, always, up to a short time prior to his stopping business, of much greater value than $5,000. He says that he had a very large trade, and did an extensive business from the time he commenced until he stopped business; that his gross sales up to July, 1869, amounted to $20,000 and upwards; and from July 1st, 1869, to Sep-

tember 24th, 1870, his gross sales amounted to $48,000, or thereabouts; that during all the time he was in business his credit was good, large and extensive with the banks, and with those from whom he made purchases, and that it never became necessary for him, in procuring credit, to make any exhibit, statement, or representation whatever as to his pecuniary affairs, or ability, or the amount, condition or circumstances of his trade or business. That the plaintiffs never asked or questioned him about his pecuniary ability or circumstances, and they never asked for security; that at the time he purchased the goods, and gave the notes in question, his trade was very large and extensive, and he then believed, profitable, and he believed himself entirely solvent, and able to pay all his debts and liabilities. He paid the plaintiffs, on account, September 6th, $500, and September 7th, $500. The payments to the plaintiffs from January 1st, 1870, including the September payment, amounted to $10,000, or thereabouts. He says that September 23d, he made an examination of his business and then found that the debts owing to him amounted to $5,000 and upwards, and his stock in business to about $5,000, as near as he could estimate the same, and that he then owed to divers persons about $12,000, and he then became satisfied that he could not pay his liabilities as they should mature, but he believed his stock in trade, debts due him and his other property and assets, were more than sufficient to pay all his liabilities: That he that day negotiated the sale of his stock in trade to White, a grocer in Hamilton, for $1,500, and completed the sale on the 24th of September. He says this sale was not made with the intent to defraud his creditors. Recurring again to his business in September, prior to the sale to White, he says he paid to the plaintiffs September 12th $300, September 13th $100, September 19th $250. He says that all the money he received in his business, including the 23d September, were paid out by him in and about his business, to his cred-

itors, except a small portion used by him in support of his family.

The defendant's brother, Roderick L. Ashbough, makes an affidavit in relation to the $1,000 mentioned in Brown's affidavit, as a sum, which defendant said to Brown, his brother was to let him have. The short of the matter, as stated in this affidavit, was, that Roderick, at one time, had some talk about going into partnership with his brother, the defendant, and that in his conversation with Brown, he simply stated these facts. Many other facts in relation to the defendant's business, are stated in the affidavit, tending to show that the business was fairly conducted. An account of payments to plaintiffs, beginning January 4th, 1870, to September 19th, is appended to the affidavit, showing payments to the amount of $8,821.

The plaintiffs read, on the motion, a large number of affidavits taken in Canada, in support of the order of arrest, and in reply to the affidavits read in behalf of the defendant. I have read them all with care. All the plaintiffs make affidavits, and they all state that the defendant made representations to them.

It will be well, perhaps, to notice those affidavits more particularly, upon the question of representations. The plaintiff, Gillespie, states that the defendant has often stated and represented to deponent, that he was doing a good business, and was making money, and on one occasion, he stated to deponent, that he could get all the money he wanted from Mr. Worthington, (a relative of his,) but that he did not require it, and in consequence of representations of this kind, made from time to time, the plaintiffs were led to believe the defendant was solvent, and they accordingly supplied him with goods to a large amount, which they would not have done but for his representations as to the soundness of his financial position. He then states facts, tending to prove the insolvency of the defendant for at least six months before he absconded, and adds his belief

that the defendant must have known that he was insolvent; says that he believes defendant did procure an advance of $1,000 from Worthington on condition of giving security.

There is a schedule appended to this affidavit in which the monthly purchases from, and payments to, the plaintiffs, begining in June, 1868, and including September, 1870, appear. Purchases were made in every month; in June, 1868, $68, in July, $1,410. The amounts vary from $2,567, (the largest,) in November, 1869, to $185, (the smallest,) in February, 1869. They amounted in the seven months of 1868, to $7,550, in 1869, to $9,554, in the nine months of 1870, to $11,637. Payments were made in every month, except June and December, 1868, and August, 1870. In 1868, $3,080, in 1869, $9,415, in 1870, $9,253. In some of the months, the payments were much larger than the purchases; this was so in February, March, April and May, 1870. In September, the purchases were $1,397, and payments $1,650.

The plaintiff, Routh, states that during the whole time of the trading with the plaintiffs, it was the defendant's constant practice to make statements to one or the other of the plaintiffs, that he was doing a large and profitable business, and that his affairs were in a most satisfactory state. That he frequently told the deponent that he must buy very close, because he was going to pay for what he bought, and that the plaintiffs sold him goods, and gave him credit principally on the faith that his representations to them of his continued prosperity, were true, and that plaintiffs would not have sold him goods, nor given him credit, to the extent they did, but for such statements and representations.

That in July, 1869, the account of the defendant with the plaintiffs had become very large, and they requested him to reduce it; the defendant then stated to the plaintiffs that there would be no difficulty in doing this; that he was in a splendid condition, and could buy wherever he liked,

and relying upon these statements, the plaintiffs continued
to deal with him as before, which they otherwise would
not have done. He further states that defendant for nine
months previous to his absconding, was indebted to the
estate of G. L. Foster & Co., upwards of $2,800 ; that he
was frequently called upon to pay this, but put off doing
so, because he had not the means, and the greater part of
this debt is still owing and unpaid ; that the existence of
this debt was never disclosed to the plaintiffs ; that if
deponent had been aware of the fact, he never would have
sold defendant goods, or given him credit to the extent he
and the plaintiffs did.

William E. Murray, of Toronto, makes an affidavit tend-
ing to prove that the defendant by false representations
procured credit from the late firm of G. L. Foster & Co.
The defendant has had no opportunity to answer this
affidavit.

In the affidavits made by the plaintiffs, they deny many
of the facts stated by the defendant, having reference to
matters outside of the question of *representations*. Some
of the plaintiffs and other persons have had access to the
books of the defendant. One great object of these affidavits
was to show that the defendant was insolvent in April,
1870, and so continued to September 23d, and that he so
knew, or must have so known, and without attempting to
write down here the substance of these affidavits, I will say
they do show, to my satisfaction, that the defendant was
insolvent and unable to pay his debts in April, and that he
so continued up to the time he sold his stock in trade to
White. After the defendant absconded from Canada, his
property was seized for his creditors, and Finley, who was
one of the official assignees of the estate and effects, duly
appointed by the county, makes an affidavit, and shows,
by a schedule, that the debts of the defendant on the 19th
day of April, 1870, amounted to $12,419 24, and the assets
and property to $7,875, leaving a deficit of $4,544 24.

This schedule was made up from the defendant's book of account, and the best information the deponent could obtain. The amount as stated in the schedule then owing to the plaintiffs, was $3,866 58. A large number of these affidavits allege the insolvency of the defendant in April, and they state some facts tending to show that the defendant must have been aware of his insolvency, and expressing the belief that he knew that he was insolvent. I have endeavored to consider all these facts carefully, and I am not satisfied that the defendant knew in April, 1870, that he was insolvent, or that he was in failing circumstances. He had taken an inventory, or made an examination, some ten months before, and he then understood himself to be solvent, and that his small capital of $1,600, had not been impaired. His business was increasing, and became large. His credit continued good. I think when he made the examination on the 23d September, he must, or ought to have known that he was insolvent, yet, he says, he still thought his property would pay his debts, though he would be unable to pay the debts as they matured. He does not state the value of his property other than the stock in trade and the debts due him.

Finley, the official assignee, makes a second affidavit as to the defendant's condition at the time he left Canada. He makes the liabilities of the defendant, as appears from his books, and from claims filed with him as assignee, $14,400, and upwards. He puts the stock in trade at $4,597 50, book debts, $3,520, furniture and other chattels, $475. There is considerable difference in the amounts as stated here, and by the defendant, and some difference between the statements of the amount for April 19, and September 23, but do they prove that the defendant knew he was insolvent? He was doing a business of $30,000 or $40,000 a year. It is quite probable, that the defendant was a hopeful, sanguine man, and that he was not a careful business man; that he continued his business from day to

day, without stopping to make an invoice or examination, and it may be that he did suppose his business was prosperous. The question, however, in the case, and the only question which I am now examining is, in the language of the Code, has the defendant been guilty of a fraud in contracting the debts? and in deciding this question, all the facts are to be considered. It is often extremely difficult to answer this question satisfactorily. It is a question of fact to be decided by the court, in a case where the action is upon contract to recover the goods contracted, and the plaintiff holds the affirmative of the issues. (See *Frost* agt. *McCarger*, 14 *How.*, 131.)

It must be decided upon all the facts and circumstances brought to the attention of the court. Its decision has no reference to the recovery of a judgment for the debt, but it affects the remedy. Its decision determines the question of imprisonment or non-imprisonment, upon the judgment, and nothing more.

In this case, I am not able to answer the question in the affirmative. In my opinion, the defendant was not guilty of fraud in contracting the debts. It may be that conversations were had between the parties substantially as stated by Brown and the other plaintiffs, and that the defendant may not recollect them. What was the character of these conversations? Brown says, that at the time of obtaining the goods, and for the purpose of inducing the plaintiffs to make sales of the goods to him on credit, the defendant represented, &c. Now, Brown did not intend to say, that on each occasion, when defendant ordered goods, he made these representations. The parties were neighbors, doing business in the same place, and well acquainted with each other. Now, as to the representations, viz.: the defendant had a large trade, and was doing well, and making money, and was able to pay his debts. These are the representations according to Brown, (except as to the $1,000, defendant was to get from his brother, as to which

hereafter.) That the defendant was doing a large trade, was true, and the plaintiffs knew this fact, and I think, that the defendant really thought he was doing well, and making money, and able to pay his debts, such were his opinions. His business was increasing and he was probably elated with it. But are such conversations uncommon between neighbors engaged in the same business? Are they understood to be other than expressions of opinion, loose, casual conversations, remarks that may be forgotten in an hour? Not, I admit, if they were made with a view of obtaining credit, and the person making the remarks, or representations so understood at the time. Brown says, that the representations were made for the purpose of inducing the plaintiffs to make sales of the goods to the defendant on credit. This is an inference of Brown. As to the $1,000; according to Brown, the defendant told him he had got, or was getting $1,000 from his brother, to increase his capital, which statement was false as Brown was informed by the brother. This matter is noticed by the defendant and his brother in their affidavits, and the facts stated in a manner showing that Brown was probably mistaken. Whatever the defendant said to Brown as to his brother and $1,000, had no reference to the defendant's responsibility. There was at one time some talk between the defendant and his brother of the brothers going into partnership with him and putting in $1,000 capital, and this according to the defendant, was mentioned by him in connection with certain propositions made by Brown to him about a partner, and according to the brother, he simply stated to Brown the facts. Brown says that defendant *solely* by means of representations led the plaintiffs to believe that the defendant was solvent and able to pay his promissory notes at maturity, and that on the faith of such representations, the plaintiffs gave him the credit, &c. Is it probable that the defendant, solely by means of the representations, led the plaintiffs to believe that the

defendant was solvent, &c. ?  We are trying to answer the question, whether the defendant was guilty of a *fraud* in contracting the debts, and in passing upon this question, I endeavor to keep in mind all the statements made by all the plaintiffs and others, bearing upon the question, without repeating them.  Let us take a broader view of the case.  This is not the case where credit is, for the first time, obtained.  The parties were not strangers.  The defendant entered into business in 1868, with a small capital, the amount of which was made known to the plaintiffs.  They immediately commenced selling their wares to the defendant, and for aught that appears in the case, they always filled his orders, and the trade was reasonably satisfactory.  We hear nothing of any representations made by the defendant, touching his circumstances, prior to the sales represented by the notes in question, the earliest one, dated in May, 1870, except from the plaintiff, Routh, who says that during the whole time of trading with the plaintiffs, it was the defendant's constant practice to make statements, &c.  Assume this to be so, and that for six months prior to his sale to White, he was insolvent, and it will be necessary to advance further, and find that the representations were fraudulently made, that is to say, he knew they were false.  Let us look into the accounts.  According to the schedule furnished by the plaintiff, Gillespie, the balance owing to the plaintiffs at the end of the year, 1868, was $4,470, and this would be increased, at the end of 1869, by the small balance of $129.  The payments made in January, February, March and April, 1869, in excess of the purchases in the same months, were $1,732, thus reducing the debt to $3,867.  During the remainder of the year, the debt was increased some $1,861, and early in 1870, the debt was reduced, and then it was increased.  In several of the months of this year, the payments considerably exceeded the purchases, this was so in September.  The debt was, however, con-

siderably increased in 1870. These accounts, showing the course of business between the parties, are instructive, they prove, I think, that the parties, sellers and purchasers, were imprudent in the creation of debts so large ; but do they prove fraud in the purchaser? fraud in May, 1870, for to sustain the order of arrest, the court must find that all the goods, represented by the notes, were fraudulently purchased. It will not be sufficient to find that some of the purchases in June, 1870, and subsequently were fraudulently made. If a plaintiff in his action, embraces demands, in which he is not entitled to the remedy of arrest, with those in which he is entitled to such remedy, the remedy is waived. He can have but one judgment and one execution, and he has no right to imprison the debtor for such portion of the debt as was not fraudulently contracted. It is important to ascertain and possess clear conceptions of what is meant, by being "guilty of fraud in contracting the debt, or incurring the obligation for which the action is brought."

There is I apprehend, much looseness in practice, in obtaining orders of arrest, upon the ground of fraud in contracting the debt, in cases of alleged false representations. It will be useful to look into some of the late authorities. In *Nichols* agt. *Primer*, (18 *N. Y.*, 299), PRATT, J., says, "to contittute fraud in such cases, there must be an intention to cheat ; at least there must be an intention to do an act, the necessary result of which will be to cheat and defraud another.

In *Brainard* agt. *Spring*, (42 *Barb.*, 470), some *three* recent cases, which it was supposed had modified and much impaired the old and well established rule of *scienter*, i. e. that the party making the false representations, *knew* they were false, were examined and the old rule was vindicated and re-asserted.

In *Marsh* agt. *Falker*, (40 *N. Y.*, 562), DANIELS, J., after stating that the representations were sufficient if fraudu-

lently made, to warrant a recovery, says, that the plaintiff "should satisfactorily prove that those representations were fraudulently made. That they were not only false in fact, and caused the loss sustained by him, but beyond this that they were made with the intent to deceive him. This was the *gist* of the action, and it has always constituted its distinguishing element, and as such it has been described and maintained by all the authorities." He then cites numerous authorities, the first being *Pasley* agt. *Freeman*, 3 (*T. R.*, 59). Justice GROVER, is equally clear in his opinion. In *Chester* agt. *Comstock*, published in a note to the case, p. 575, WOODRUFF, J., reiterates the same doctrine, and cites *Pasley* agt. *Freeman*; and *Addington* agt. *Allen*, (11 *W.*, 374). WOODRUFF, J., uses the language; "Whatever the representations may be, it is in such actions, a question, and a vital question, whether it was fraudulently made; that it was made imprudently or indiscreetly, is not enough; deceit is the gist of the action; falsehood, the intent to deceive, and damages must concur." These cases were decided in the court of appeals in 1869. And I have referred to them particularly, as they remove all doubt as to the state of the law, and they are applicable when the question arises upon the application for the order of arrest, whether the defendant has been guilty of fraud in contracting the debt, by means of representations. The present case is not a case where questions are put directly to the party applying for credit, for the purpose of ascertaining his condition, and whether he is worthy of credit, and the party questioned so understands and deliberately answers.

All such inquiries should be fairly made, and the answers should be clearly and distinctly given. There should be no circumvention, and there aught not to be any misapprehension between the parties. The question is, at all times, one of fraud, and the party answering or making the representations, aught to know the full extent of the answers or representations, and whether he is committing a fraud.

The party giving the credit, aught not to rely on general statements made in loose, casual, conversations.    He should distinguish between mere opinions and facts, as shown by the conversation or representations.

The party making the statements, aught in fairness, to understand that they are relied upon by the other party, and they are inducing the credit given him.    In administering the law courts can not well be too careful in protecting the cautious, prudent vendor, against the frauds of the purchaser.    The fraud must, however, be satisfactorily established, and there aught to be little difficulty in this, if the vendor observes the proper precautions, and sees to it, at the time, that the vendee is under no misapprehension, as to the representations he makes and the effect they are producing, to wit: the procuring of credit.    It may be well to add that the creditor, who applies for an order of arrest, should distinctly understand, that he is not entitled to this remedy, unless a fraud—a cheat, has been practiced upon him.    The representations must be material, and such as are well calculated to deceive, to induce credit; they must of course, be false, and the party making them must know them to be false; the party giving the credit must believe the representations to be true, and they must have induced—caused him to give the credit and part with his property.

As I have come to the conclusion, that the facts appearing in the affidavits, fail to show that the defendant was guilty of fraud in contracting the debts, the order of arrest cannot be sustained upon this ground.

Several other questions, however, have been raised upon the papers before me; and have been discussed by the counsel; indeed, the principal question discussed upon the hearing of the motion, was whether our remedy of *arrest* can be applied to cases arising in a foreign country..    Upon a reference, by the counsel, to *Blason* agt. *Bruno* (21 *How.*, 112), I was of the impression, for the moment, and think I

so intimated, that our Code remedy by arrest would not apply to frauds committed in a foreign country. I have examined the question and shall briefly state my opinion. I have no doubt *Blason* agt. *Bruno* was properly decided. The fraud alleged was, that the defendant in Cuba, collected his debts there and brought the proceeds to this country, without paying his creditors in Havana. I do not think the remedy by arrest, given by the Code, is applicable to such a case.

I am not able to see why our remedy, by arrest, should not apply to cases where the debt is fraudulently contracted in a foreign country. The language of the Code is general; " that defendant may be arrested as herein prescribed, in the following cases: 4th. "When the defendant has been guilty of a fraud in contracting the debt or incurring the obligation for which the action is brought.'" Why should not this remedy be given to any suitor in our courts? The general rule is that the *lex fori* governs as to the remedies of the parties. STORY says, " it is universally admitted and established that the forms of remedies and the modes of proceeding, and the execution of the judgments, are to be regulated solely and exclusively by the laws of the place where the action is instituted; or as the civilians uniformly express it, according to the *lex fori*. Arrest in an action to recover a debt is a common law remedy. The law was changed in this state by the non-imprisonment act of 1831, chapter 300. But, by that act (§ 4, *sub.* 4), an arrest was authorized when it appeared by affidavit, "that the defendant fraudulently contracted the debt, or incurred the obligation, respecting which, such suit is brought." The Code preserves the provision of the act of 1831. The mode of proceeding, upon the arrest, under that act, differs materially from the mode adopted by the Code. Now the arrest is a proceeding in the action, and the imprisonment is by the execution founded upon the judgment. The Code (§ 178), carefully preserves the act of 1831, and its remedies

may now be resorted to, but the remedies given by the Code are more simple and convenient, and those given by the act of 1831, have fallen very much into disuse. It is seen by these references that the common law remedy by arrest in actions to recover debts, still remains in force in the cases where the debt was fraudulently contracted. In my opinion it is quite immaterial *where,* or under what circumstances the fraud was practiced by the defendant.

My attention, on the argument, was called to *City Bank* agt. *Lumley,* (28 *How.,* 397,) in which Judge BRADY remarks upon the case of *Blason* agt. *Bruno, (supra,)* and according to the synopsis of the reporter, decided that the arrest of a person here in a civil action for fraudulent representations in the purchase of property in a foreign country, of a foreign creditor, will be held good when such property or its proceeds are brought here by him, although he could not have been arrested for such acts in that country. I am not able to perceive why the qualifications, " where such property or its proceeds are brought here by him," has been inserted in the rule. In my opinion, the fact of the property or its proceeds being brought here, is immaterial. The creditor is entitled to the remedy of arrest, because it never has been abolished, and is expressly authorized, where the debt has been fraudulently contracted. It is not material whether the defendant has any property or not. I do not understand Judge BRADY as qualifying his opinion as indicated in the head notes. In answering counsel as to what was decided in *Blason* agt. *Bruno,* he says it only decides that the removal and fraudulent disposition of property, contemplated by our statutes, must be within the limits of the state. He then refers to another portion of Judge INGRAHAM's opinion, that a different rule exists where the defendant obtains the property fraudulently in a foreign country, and brings it here, and adds that the case is not authority for the doctrine asserted by the defendant's counsel. He neither approves or disap-

Brown agt, Ashbough.

proves of what Judge INGRAHAM has said, but proceeds to
say that we find too, on examination of earlier cases, that
the remedy is governed by the *lex fori*, and that this is so
though by the law of the country where the transactions
arose, and of which the parties were residents, the defend-
ants could not be arrested. I concur fully in this, and refer
to the authorities cited by Judge BRADY. I have referred
to these two cases, thus particularly, for one, among other
reasons, that the attorneys, or counsel, who procured the
affidavits to be made, in the case I am examining, must
have had these cases in view at the time.

The volume of evidence has been much enlarged by an
attempt to show that the defendant brought from Canada
to this state the proceeds of the sale of his stock in trade
to White, and perhaps, something more, and attempts to
disprove this. I should like to take leave of this case here,
by vacating the order of arrest, upon its merits, as to the
contracting of the debts to recover which the action is
brought, but the papers raise, and the counsel have dis-
cussed several other questions. As I have stated in the
early history of the case, one of the grounds, put forth for
the order of arrest, is that the defendant had disposed of his
property with intent to defraud his creditors. This has
reference to the sale made by defendant on the 24th Sep-
tember, to White, of his stock in trade for $1,500. The
facts have been fully stated, and I have no hesitation in
saying that such sale was fraudulent and void as to
creditors. But, this will not, in this case, help the plaintiffs
in upholding the order of arrest, as will presently appear.
Such sale had no connection with the circumstances under
which the goods were purchased for which the notes in suit
were given. In my opinion, the remedy given by the 5th
subdivsion of section 179 of the Code, viz.: " when the
defendant has removed, or disposed of his property, or is
about to do so with intent to defraud his creditors," cannot
be applied to cases arising in foregn countries. I am in-

clined to think, with Judge INGRAHAM, in *Blosan* agt. *Bruno*, (21 *How.*, 112,) the offense of disposing of property, to defraud creditors, cannot be committed in a foreign country, between foreigners, so as to bring the case within the provisions of the Code on this subject. It seems to me that insuperable difficulties would arise in any attempt to apply the remedy given by the Code in such cases. A state has jurisdiction over all the persons and all the property within its limits, and it may justly seize and appropriate all the property of a debtor that is within the state, to the payment of his debts, and the removal of such property from the state, or disposing of it within the state, with intent to defraud creditors, is itself, a fraud upon the remedial laws of the state, and the policy of such laws, hence the debtor, guilty of such fraud, shall not claim exemption from arrest. Each state, or nation makes its own municipal laws, touching the property within it, and the collection of debts. In this very case, the property so sold by defendant to White, has been seized, by authority of the laws of Canada, and is now in the hands of " official assignees appointed by the county" to be administered upon, for the benefit of all the creditors of the defendant, the plaintiffs included.

The complaint of the plaintiffs has been served since the order of arrest was granted. It contains some statements of causes of action, having reference to the notes, one as to each note. They are, of course, causes of action on contract only, and for the purpose of recovering judgment for the amount of the notes. Then follows an 8th and 9th statements of causes of action, the *gravamen* of which is *fraud*. The eighth relates to the sale by the plaintiffs, of some whiskey, the plaintiffs say five barrels, at the price of $140. They say the sale was made on or about the 21st day of September, and the delivery was on the 23d. It is not necessary or proper I should express any opinion from

the affidavits, as to a fraud in this particular case, as the action is to recover damages for the fraud.

The ninth cause of action is founded upon all the frauds between the 1st day of January, 1870, and the 24th day of September, practiced in obtaining the goods on credit, and the same alleged false and fraudulent representations are set forth, as appear in the affidavits, having reference to the order of arrest. It was argued that these causes of action could be united, on the ground that they all arose out of "the same transaction or transactions, connected with the same subject of action" (*Code*, 167). I am not called upon, at this time, to pass upon this question, though I may remark that it will, I think, be found that the actions which may be united, are those that are *consistent* with, and not those which are contradictory to, each other. It is now only necessary to say, that when the plaintiff unites a cause of action, in which he is not entitled to, the remedy by arrest, with a cause of action, in which he is entitled to such remedy, he waives the right to the remedy. There is to be but one judgment and one execution, and if such judgment is composed in part, of damages in a cause of action, in which imprisonment cannot be had, the right to imprisonment is gone as to the whole judgment. (*Robinson* agt. *Flint*, 16 *How.*, 243.)

In this case, as I have endeavored to show, the plaintiff was not entitled to the remedy by arrest, in the causes of action to recover the amounts of the notes, as the defendant was not guilty of fraud in contracting the debts for which the notes were given. The motion must be granted with $10 costs.